**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JASON PAUL GILL AND KIMBERLY ELLIOTT** | **CASE NO. 23-CV-1618** |
| | **JUDGE BRIAN A. JACKSON** |
| **VERSUS** | |
| | **MAGISTRATE** |
| **DAVID LEE CAUTHRON, ET AL.** | **ERIN WILDER-DOOMES** |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**
**FILED BY THE CITY OF BATON ROUGE/PARISH OF EAST BATON ROUGE**

**MAY IT PLEASE THE COURT:**

**COME NOW,** plaintiffs Jason Paul Gill and Kimberly Elliott, who respectfully submit this *Plaintiffs' Memorandum in Opposition to Motion to Dismiss by the City of Baton Rouge/Parish of East Baton Rouge*, and respectfully aver as follows:

**STATEMENT OF FACTS**

On December 31, 2022, Tyquel Zanders ("Zanders"), a 24-year-old male with a history of mental illness, took his father's vehicle without permission. A family member reported the vehicle stolen to the Baton Rouge Police Department ("BRPD"). The family member followed Zanders and relayed his position to 911. Multiple BRPD police units converged on Zanders in downtown Baton Rouge, which led to a high-speed pursuit. (Second Complaint, Rec. Doc. 30-1, p. 9, ¶ 24) Zanders entered the on-ramp to I-10 West and crossed the Mississippi River Bridge into West Baton Rouge Parish. (p. 9, ¶ 26)

The BRPD has an official pursuit policy, General Order No. 136 ("BRPD Pursuit Policy"). For example, the BRPD Pursuit Policy restricts high-speed chases to only two patrol vehicles to reduce the risk of harm to the general public.[1] However, despite exiting BRPD's jurisdiction, five

---

[1] The BRPD Pursuit Policy stated the following: (1) no more than two units shall engage in a chase; (2) chases will be immediately terminated whenever the person being pursued can be positively identified and there is no longer a need for immediate apprehension; (3) the chase shall conclude where the immediate danger to the public

1

(5) unidentified BRPD police officers ignored the official pursuit policy and continued to pursue Zanders through West Baton Rouge Parish. Zanders exited onto La. Hwy. 1 South towards and through the towns of Addis and Brusly. (p. 10, ¶ 27) During the pursuit, the BRPD officers ran at least three red traffic lights without slowing down, drove onto the roadway shoulders, passed bystanders waiting at red lights at high-speeds, and forced bystanders to drive into the grass median. (p. 10, ¶ 27)

Officer David Cauthron ("Officer Cauthron"), an officer with the Addis Police Department, joined in the chase behind the five BRPD officers. (p. 10, ¶ 27) A post-accident investigation performed by the West Baton Rouge Sheriff's Office ("WBRSO") revealed that the BRPD officers and Officer Cauthron exceeded speeds of 100 mph during the noon lunch hour on a holiday and in areas of La. Hwy. 1 with heavy traffic. (p. 11, ¶ 29) The WBRSO investigation uncovered evidence that BRPD officers ran at least three red lights without slowing down and while traveling at extremely dangerous speeds of between 80 to 100 mph. (p. 10, ¶ 28) Thus, all five BRPD officers ignored the BRPD Pursuit Policy and violated the statutory duty placed on emergency responders to slow down or stop when approaching a red traffic light. *See* La. R.S. 32:24(B)(2).

Zanders eventually made a U-turn through a grass median, traveling back towards I-10 on La. Hwy. 1 North. (p. 11, ¶ 30) Due exclusively to his rear positioning in the multi-police force group, and not because of his jurisdictional authority, Officer Cauthron pulled behind Zanders and took the group's lead in his full-size 2019 Chevrolet Tahoe. (p. 11, ¶ 30) Officer Cauthron approached the intersection of E. St. Francis Street and La. Hwy. 1. (p. 12, ¶ 33) Officer Cauthron saw the red traffic lights and bystander vehicles crossing the intersection. However, following the

---

created by the pursuit is less than the immediate or potential danger should the public remain at large; and (4) the determination should be based on whether the suspect's identity is known, what violation they committed, and the amount of traffic in the area, location, and time of day. (¶ 25) The BRPD Pursuit Policy further authorized BRPD officers to exceed the speed limit during a chase, so long as their actions did not endanger life or property. (¶ 29)

prior actions of the five BRPD officers, who previously ran three red lights without slowing down at excessive speeds, Officer Cauthron intentionally decided to run the red traffic light at approximately 86 miles per hour without slowing down. (p. 12, ¶ 33)

Eye-witness testimony, video footage, and electronic vehicle data proved that Officer Cauthron made no attempt to brake before proceeding through the red traffic light, despite seeing bystander vehicles actively crossing the intersection. (p. 12, ¶ 33) Eight seconds before entering the intersection against the red traffic signal, Officer Cauthron knowingly decided to proceed through the intersection at an extremely dangerous rate of speed of approximately 86 miles per. As recorded by his own words, "THIS IS GOING TO HURT.", Officer Cauthron proceeded to through the intersection with virtual certainty of serious injury or death to any bystander motorist who failed to give him right of way. (p. 12, ¶ 34) A post-accident investigation revealed that Officer Cauthron saw the red traffic lights and crossing traffic with sufficient time to apply braking and either stop or safely pass through the intersection without incident. (p. 12, ¶ 35)

Officer Cauthron's 2019 Chevrolet Tahoe broadsided a small 2017 Mazda 3 crossing over La. Hwy. 1 with a protected green light. Teenager decedent Margaret Dunn operated the Mazda 3. Her teenage friend, Caroline Gill, occupied the front-passenger seat, and her teenage brother, Liam Dunn, occupied the back seat. (p. 13, ¶ 36) The severe impact with Officer Cauthron's full-sized Tahoe killed Margaret Dunn and Caroline Dunn and seriously injured Liam Dunn. (p. 13, ¶ 36)

Officer Cauthron was indicted for purposefully barreling through the intersection at 86 miles per hour and without ever applying his brakes or slowing down and with criminal intent to seriously injure or kill an innocent bystander motorist(s) crossing the intersection. (p. 4, ¶ 10) On March 18, 2024, Officer Cauthron pled guilty to two counts of manslaughter for the deaths of Margaret Dunn and Caroline Gill and one count of negligent injury for those injuries sustained by

Liam Dunn. (p. 38, ¶ 105) Notwithstanding the several violations of the BRPD Pursuit Policy and La. R.S. 32:24(B)(2) by the five BRPD officers, and only because no BRPD officer impacted the Mazda 3, the BRPD internal affairs committee ratified its officers' conduct, finding no "egregious" driving violations that warranted supervisory action. (p. 32, ¶ 88)

**LAW AND ARGUMENT**

I.  **The Rule 12(b)(6) Standard of Review for the Gills' *Monell* Claim Against the EBRP.**

Under Rule 12(b)(6), the district court accepts all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs. *Doe ex rel. Magee v. Covington County School Dist. ex rel. Keys*, 675 F.3d 849 (5th Cir. 2012); *citing Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir.2008). To survive dismissal pursuant to Rule 12(b)(6), plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009); *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133 (5th Cir.2009). "[T]o state a claim for relief that is plausible on its face," the allegations must "raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly, Id. at 556.*

The City/Parish may not be held liable under 42 U.S.C. 1983 ("Section 1983") on a theory of vicarious liability. *See Maze v. Garber*, 2020 WL 2892174, (W.D. La. 6/1/2020), *2; *citing Hicks-Fields v. Harris Cty., Texas*, 860 F.3d 803, 808 (5th Cir. 2017), *cert. denied sub nom. Hicks-Fields v. Harris Cty., Tex.*, 583 U.S. 1014, 138 S. Ct. 510 (2017). A municipality becomes liable for a Constitutional violation when the allegedly unconstitutional conduct implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers. *Maze, Id.*; *citing Monell v. New York City Dep't of Soc. Serv., of City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018 (1978). To state a *Monell* claim, a plaintiff must allege facts demonstrating that (1) an official policy, (2) promulgated by the municipal policymaker, (3) was

4

the moving force for the violation of a constitutional right. *Maze*, *Id*. at \*2; *citing Blanchard-Daigle v. Geers*, 802 Fed.Appx. 113, 115–16 (5th Cir. 2020).

Official policy may exist through "written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Maze*, *Id*.; *quoting Blachard-Daigle*, *Id*. A plaintiff alleging an official policy by *custom or practice* must demonstrate a pattern of conduct that is specific and similar to the constitutional violation alleged by the plaintiff. *Maze*, *Id*.; *citing Hicks-Fields*, 860 F.3d at 810. A plaintiff "must do more than describe the incident that gave rise to his injury." *Maze*, *Id*.; *quoting Ratliff v. Aransas Cty., Texas*, 948 F.3d 281, 285 (5th Cir. 2020). A plaintiff must identify the relevant policy, custom, or practice that was the motivating force for the alleged constitutional violation. *See Maze, Id.* at \*3. The factual allegations must provide fair notice of the specific policies or customs that are being challenged. *See Id*.

"In the context of Section 1983 *Monell* claims against municipalities, courts have held that relevant policy or widespread practice need not be pleaded in exhaustive detail." *Lewis v. Horton*, 665 F.Supp.3d 801 (W.D. La. 3/29/2023); *citing Maze v. Garber*, 2020 WL 2892174, at \*3 (W.D. La. June 1, 2020); *Thomas v. City of Galveston, Texas*, 800 F.Supp.2d 826, 842-846 (S.D. Tex. 2011) (explaining that "only minimal factual allegations should be required at the motion to dismiss stage."). The United States Supreme Court has held that *Monell* claims are not subject a heightened pleading standard. *Maze*, *Id*.; *citing Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). At the motion to dismiss stage, "only minimal factual allegations" are required to state a claim for policy or practice liability against a municipality. *See Donahue v. Strain*, 2017 WL 3311241, at \*18 (E.D. La. Aug. 3, 2017).

For example, the City/Parish argued that, "Complainants do not discuss any aspect [of BRPD training] in their original or supplemental complaints…." (City/Parish Memo., Doc. 36-1, p.6) However, the Gills cannot allege BRPD's training procedures with specificity, because the Gills lack access to BRPD's training procedures and supervisory actions at the pleading stage ("This is so because, at the pleading stage, plaintiffs usually will not have access to or personal knowledge of the specific details of a municipality's internal training or supervisory policies and procedures."). *Hankins v. Wheeler*, 2022 WL 2208848, (E.D. La. 6/21/22), *7.[2] The district courts recognize, "[A] plaintiff is not required to 'specifically state what the policy is, as the plaintiff will generally not have access to it.'" *Maze*, *Id*. at *3; *quoting Thomas v. City of Galveston, Texas*, 800 F.Supp.2d at 844. "The plaintiff's allegations must provide fair notice to the defendant with respect to the specific policies or customs that are being challenged." *Maze*, *Id*. at *3; *citing Thomas*, *Id*. at 844. "[A]llegations that provide such notice could include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy." *Maze*, *Id*.; *citing Thomas*, *Id*. Ultimately, at the pleading stage, a lack of training is inferred through a pattern of conduct, of the kind that caused the plaintiff's damages (*Lafleur v. Leglue,* 2018 WL 4365516 (M.D. La. 2018), *2; citing *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010)), or a single incident demonstrating the possibility of recurring situations that present an obvious potential for a violation of constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)

---

[2] In *Hankins*, the district court addressed the plaintiffs' difficulty in obtaining details of police procedures when alleging Section 1983 claims: "But Plaintiff simply is not positioned at this stage of the proceedings to provide greater elaboration on the specific deficiencies of Defendants' training policies; further factual enhancement can only come through discovery." *Hankins*, Id. at *7; citing *Thomas*, 800 F.Supp.2d at 842. "Nonetheless, it is inferable from the amended complaint that the Municipal Defendants had a policy of failing to adequately train their employees. And it can further be plausibly inferred, at this stage of the litigation, that Defendants' knowing failure to adequately train employees would, predictably, lead to the deprivation of" constitutional rights that the plaintiff suffered. *Id*.

I.  **The Gills Stated a Plausible Violation of the Fourteenth Amendment that Caused the Death of Caroline Gill.**

   A.  **To Allege a Plausible Violation of the Fourteenth Amendment Resulting from a High-Speed Police Chase, Under *County of Sacramento v. Lewis*, the Plaintiff Must Allege that the Officer Intentionally Misused His Vehicle with Actual Knowledge or Virtual Certainty that His Actions Would Cause Harm.**

Before conferring Monell liability on a municipality, the plaintiff must allege a plausible constitutional violation, such as a Fourth or Fourteenth Amendment violation.[3] In the absence of a constitutional violation, the plaintiff has not met his burden to overcome the defense of qualified immunity. *See Rios v. City of Del Rio, Tex.,* 444 F.3d 417, 425–26 (5th Cir. 2006). For example, the Fourteenth Amendment right to due process protects the individual "against arbitrary action of government." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). A court must determine whether the behavior of the governmental officer "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018) (*quoting Lewis*, 523 U.S. at 847 n.8).

The *conscience-shocking standard* is satisfied "where the conduct was 'intended to injure in some way unjustifiable by any government interest,' or in some circumstances if it resulted from deliberate indifference." *See Littlejohn v. New Orleans City*, 493 F. Supp. 3d 509, 520 (E.D. La. 2020) (*quoting Lewis*, 523 U.S. at 849–50). "Whether the point of conscience-shocking is reached when injuries produced with culpability falling within the middle range, following from something

---

[3] *See Romero v. City of Grapevine, Texas*, 888 F.3d 170, 178–79 (5th Cir. 2018) ("In order to confer liability on the City and [the police chief] for deficient supervisory conduct, there must be 'a sufficient causal connection between [the City's] conduct and the constitutional violation.' '[I]t is facially evident that this test cannot be met if there [are] no underlying constitutional violations.' ") (internal citation omitted) (*quoting Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006)); *Whitley*, 726 F.3d at 648 ("All of [the plaintiff's] inadequate supervision, failure to train, and policy, practice, or custom claims fail without an underlying constitutional violation."); *Albert v. City of Petal*, 819 F. App'x 200, 203 (5th Cir. 2020) (noting that because there was no constitutional violation, there can be no Monell claims); *Brown v. Wilkinson Cnty. Sheriff Dep't*, 742 F. App'x 883, 884 (5th Cir. 2018) (holding that because the plaintiff failed to demonstrate an underlying constitutional violation, the claims against the county and the officers in their official capacities failed); *Harris v. Serpas*, 745 F.3d 767, 774 (5th Cir. 2014) (upholding the district court's dismissal of the Monell claims because the plaintiffs had not shown there was a constitutional violation).

more than negligence but 'less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls.'" *Lewis*, *Id*. 849. (*citing Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986) ("Where a citizen suffers physical injury due to a police officer's negligent use of his vehicle, no section 1983 claim is stated. It is a different story when a citizen suffers or is seriously threatened with physical injury due to a police officer's intentional misuse of his vehicle.")).[4]

In *McGowan v. County of Kern*, 2018 WL 2734970 (E.D. Ca. 6/7/18), the federal district court examined a sheriff's deputy and county's Monell liability under the Fourteenth Amendment. The deputy ran a red light at high speed without slowing down, killing an innocent bystander traveling through the intersection with a protected green light. The *McGowan* decision is the most analogous reported decision. On September 28, 2014, defendant Deputy Clerico, a deputy with the Kern County Sheriff's Office, killed Nancy Joyce Garrett when his patrol unit collided with Ms. Garrett's vehicle in an intersection collision. *McGowan*, *Id*. at *1. At the time of the collision, the deputy was responding to a disturbing the peace and resisting arrest call from a nearby saloon around 1:44 a.m. *Id*. Deputy Clerico reached speeds of 85 miles per hour. As he approached a blind intersection, Deputy Clerico did not slow down or otherwise take precautions before entering the intersection against a red traffic light. The red traffic light had been red for one minute and twelve seconds prior to entering the intersection. The deputy pled no contest to a manslaughter charge.

The plaintiff in *McGown* alleged that Deputy Clerico caused the decedent's death by failing to follow the training he received and standard police procedures. Despite official driving policies

---

[4] For example, in *Hebert v. New Orleans City*, *supra*, the Eastern District of Louisiana found no plausible violation of the Fourteenth Amendment under the *Lewis* standard articulated *supra*. The plaintiff filed suit against several police officers and the City of New Orleans for the death of his mother after a vehicle being chased by the New Orleans Police Department ("NOPD") crashed into a building where his mother was a patron at a salon. The vehicle burst into flames, killing his mother. Although the plaintiff alleged several violations of the NOPD high-speed pursuit policy, the plaintiff did not allege that the police officers intended harm to bystanders or were deliberately indifferent to bystander safety during the pursuit. The court held that, at most, the complaint alleged that the defendant officers were negligent in their pursuit of the suspect's vehicle. *Herbert*, *Id*. at *12, fn. 46; citing *Mason v. Lafayette City-Parish Consol. Gov.*, 806 F.3d 268, 279 (5th Cir. 2015).

in place, the plaintiff alleged that Deputy Clerico participated in a departmental custom of driving at excessive speeds without due regard for other drivers or the rules of the road when responding to calls. The plaintiff alleged Deputy Clerico was trained, yet failed to obey, the driving rules.[5] The plaintiff alleged that this custom and practice of unsafe driving and at excessive speeds served as the moving force that caused the decedent's death. These unsafe and dangerous driving practices were not addressed by the sheriff's office and county until after the intersectional collision that killed Ms. Garrett. *Id*. at *2.

After Ms. Garrett's death, the sheriff's office and county performed an audit of their officers' speeds and driving practices. The audit found the following: a pattern of driving at excessive speeds, two pedestrian deaths during a pursuit in 2011, and frequent at fault police vehicle collisions. *Id*. Notwithstanding, for nine years, only six (6) deputies were disciplined for excessive speeds. *Id*. at *3. Even then, the discipline consisted of reprimands, remedial trainings involving self-study and a short quiz, and brief suspensions. *Id*. Following the death of Ms. Garrett and the sheriff taking active steps to remedy the departmental problems with reckless driving, the instances of deputies driving more than 80 miles per hour dropped dramatically. *Id*.

Addressing the *conscience-shocking standard* articulated in *Lewis*, [6] the district court identified the following legal standard for finding a plausible due process clause violation under

---

[5] The plaintiff alleged that Deputy Clerico was trained to follow the same rules of the road as other drivers, drive with due regard for the safety of other drivers during emergency driving, speeds over the posted speed limit were rarely justified and should be avoided, and when entering an intersection against a red light, he was to slow his vehicle to the point that he could safely stop in case another vehicle failed to yield the right of way. He was also trained to scan the intersection, fluctuate the sound of his siren, make eye contact with pedestrians and other drivers before proceeding, and pre-clear each lane of the intersection one lane at a time, both before and as he proceeded through it. The deputy was trained that he should stop at red light even while emergency driving. *Id*. at *1.

[6] The federal district court examined Deputy Clerico's actions for a plausible violation of the Fourteenth Amendment under conscience-shocking standard articulated in *Lewis, supra*. Consistent with the Fifth Circuit, the Ninth Circuit adopted a "purpose to harm" standard involving injuries arising from police vehicle collisions. *McGowan, Id*. at *6-*7. The determination is whether the police officer acted with "'the intent to inflict force beyond that which is required by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability under § 1983.'" *Id*. at *7. A plausible violation occurs where "an officer may be found to have acted with a purpose to harm by acting so wantonly and with such extreme disregard for the consequences of his actions that a jury could

the Fourteenth Amendment involving a police vehicle: (1) officers may violate due process when they intentionally misuse their vehicle; (2) the identity of who is injured by the officers' conduct is immaterial to the application of the appropriate legal standard; and (3) that implied malice or intent may be alleged where a defendant acted with a purpose to harm, *i.e.*, acting with actual knowledge or virtual certainty that his actions would cause harm. *Id*. at *9. The district court concluded that a jury could reasonably find such alleged actions were undertaken to induce lawlessness, or to terrorize, cause harm, or kill, in the absence of legitimate law enforcement objectives. *Id*. at *9; quoting *Lewis*, 523 U.S. at 855.

Utilizing this legal framework, the district court found that the plaintiff sufficiently alleged a plausible claim that Deputy Clerico violated Ms. Garrett's Fourteenth Amendment right of due process. Deputy Clerico acted with a plausible implied malice or purpose to harm: intending to drive through the intersection at an extremely dangerous speed and without slowing down and with the knowledge that the act threatened life and with a conscious disregard of that threat. The plaintiffs alleged that Deputy Clerico was operating at a dangerous speed and knew the traffic control signals were red. Because the intersection was obstructed by a commercial building, the deputy also knew that he could not know if another driver was approaching the intersection unless he slowed down and observed the intersection. The deputy's conduct also violated several departmental policies and he pled no contest to the manslaughter charge.

In finding that the *McGowan* plaintiff alleged a plausible Fourteenth Amendment violation against Deputy Clerico, the district court reasoned, "The facts now alleged in the proposed second

---

find that the behavior shocks the conscience." *Id*. at *7. Relying upon the Fifth Circuit's decision in *Checki v. Webb*, 785 F.2d 534 (5th Cir. 1986), the court recognized that a "a law enforcement officer may violate due process by intentionally misusing their vehicle." *Id*. at *8. The court explained that *implied malice* was the widely accepted legal standard to find that a defendant "intended to do an act that is dangerous to human life, with the knowledge that the act threatens life, and with a conscious disregard of that threat.'" *Id*.

amended complaint, including the exceptionally high rate of speed relative to the posted speed limit, the complete lack of visibility of the intersection, and the obviousness of the danger involved in blindly entering an intersection against a red light traveling at 85 miles per hour, are extreme." *Id*. at *10. "The court observes that driving a vehicle in a manner that virtually assures someone will be killed is not dissimilar from indiscriminately firing a gun: if either is done without a legitimate law enforcement reason to do so, they epitomize an 'arbitrary action of government,' which is the 'touchstone of due process.'" *Id*. at *10; citing *Lewis*, 523 U.S. at 845 (quoting *Wolff*, 418 U.S. at 558); *citing A.D. v. Ca. Hwy. Patrol*, 712 F.3d 446, 453 (9th Cir. 2013); and *Porter v. Osborn*, 546 F.3d 1131, 1141 (9th Cir. 2008).

### B. Multiple Police Officers May Be Jointly and Severally Liable for Participating in a Group or Concerted Effort that Results in a Constitutional Violation.

In *Richman v. Sheahan*, 512 F.3d 876 (7th Cir. 2008), the Seventh Circuit examined four situations justifying joint and several liability on multiple police officers who engage in a group or concerted effort that results in a constitutional violation. In *Richman*, multiple deputies actively participated in holding down an arrestee, causing hypoxia. The court explained that the officers could be found liable, "as a participant in the conduct giving rise to the peril." *Id*. at 885. The court analogized the situation where two officers stop a vehicle, one officer removes the key from the ignition, and they both drive off together with the key, abandoning the passengers to their fate. The court held that the second officer would be jointly and severally liable provided he knew or should have known of the first officer's illegal actions. *Id*.; citing *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir.2000); *Thompson v. Boggs*, 33 F.3d 847, 856 (7th Cir.1994); *Byrd v. Brishke*, 466 F.2d 6, 10–11 (7th Cir.1972); and *Gaudreault v. Salem*, 923 F.2d 203, 207 n. 3 (1st Cir.1990).

In *Nesmith v. H.D. Alford*, 318 F.2d 110 (5th Cir. 1963), the Fifth Circuit reached a similar result involving group or concerted effort that resulted in a constitutional violation. The plaintiffs

brought suit against the police commissioner, police chief, and several officers for false imprisonment, malicious prosecution, and violation of civil rights. The court held that the officials and officers were jointly and severally liable for actively participating in a concerted effort that ultimately caused the injury. The court held that, "Their actions throughout the whole sequence of events are so intertwined and interlocking that these Defendants must fall together." *Id*. at 119.

In *Estate of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014), the Tenth Circuit similarly examined multiple officers' liability for the death of an arrestee that occurred during an arrest. "Because the Defendants here engaged in a group effort, a reasonable jury could find them liable for any underlying finding of excessive force." *Quoting Bletz v. Gribble*, 641 F.3d 743, 754 (6th Cir.2011) ("A police officer may be responsible for another officer's use of excessive force if the officer actively participated in the use of excessive force."); *citing Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir.1985) (applying in excessive force suit under § 1983 the "axiomatic" principle "that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury").

In conclusion, multiple police officers may be held jointly and severally liable for a constitutional violation when multiple officers actively participated in a group or concerted effort with actual or constructive knowledge of the illegal conduct giving rise to the injury. Whether the officers' collective actions are so intertwined and interlocking that the defendants must fall together constitutes an issue of causation, a question of fact for the jury to decide at trial.

> **C. Plaintiffs Alleged a Plausible Constitutional Violation Against the BRPD Officers and Officer Cauthron, Who Actively Participated in a Group and Concerted Effort to Arrest Zanders and Equally Participated in the Reckless Driving Practices That Ultimately Caused Caroline Gill's Death.**

Similar to Deputy Clerico in *McGowan, supra,* who was trained in proper emergency driving procedures, the five BRPD officers who actively participated in the group and concerted

effort to arrest Zanders were supposedly trained to follow La. R.S. 32:24(B)(2) and the BRPD Pursuit Policy. Notwithstanding, the BRPD officers willfully ignored and violated La. R.S. 32:24(B)(2) and the BRPD Pursuit Policy. The BRPD officers knew Zanders' identity and the year, make, and model of his vehicle, yet five BRPD officers, not the maximum two officers, exited their jurisdiction and pursued Zanders at speeds reaching 100 mph during the noon lunch hour on a holiday and in areas of La. Hwy. 1 with heavy traffic. (Sec. Comp., p. 11, ¶ 29) Prior to Officer Cauthron's collision, the BRPD officers ran at least three red lights without ever slowing down at speeds ranging from 80 to 100 miles per hour. (p. 10, ¶ 28) The BRPD officers also drove onto the roadway shoulder and passed cars waiting at red lights at extremely high rates of speed and forced bystander motorists to drive into the grass median. (p. 10, ¶ 27)

Thus, the BRPD officers actively participated in the group and concerted effort with Officer Cauthron to arrest Zanders and equally participated in the same reckless driving practices that ultimately caused Caroline Gill's death. By running multiple red lights at speeds exceeding 80 to 100 mph and without slowing down, the BRPD officers started and created the dangerous environment leading to Caroline Gill's death. (p. 30, ¶ 85) The BRPD officers' conduct caused and/or emboldened Officer Cauthron to engage in the same dangerous driving behavior once he took over as the group's lead unit. (p. 31, ¶ 87) The group continuously intentionally misused their respective vehicles during the pursuit to apprehend Zanders. (p. 31, ¶ 87)

By chance of his positioning in the group, and not because of his jurisdictional authority, Officer Cauthron turned behind Zanders and took the group's lead in the high-speed pursuit. However, unlike Deputy Clerico in *McGowan, supra,* who could not see the victim's vehicle approaching the blind intersection, Officer Cauthron observed innocent bystanders crossing the road with a protected green light. (p. 12, ¶ 34) Officer Cauthron knowingly and purposefully

entered the intersection without slowing down at approximately 86 miles per hour. (p. 12, ¶ 33) Officer Cauthron possessed sufficient time to slow-down and even stop his vehicle before the arriving at the intersection. By his own words, "THIS IS GOING TO HURT.", Officer Cauthron made a conscious decision to barrel through the intersection with implied malice, or actual knowledge or virtual certainty that his action of proceeding through the red light without slowing down at 86 mph was illegal and would cause harm. (p. 12, ¶ 34)

As in *Richman*, *supra*, the fact that a BRPD officer's vehicle did not strike the victims' Mazda 3 is not determinative of joint and several liability. Whether the BRPD officers and Officer Cauthron actively participated in a group and concerted effort, and all officers knew they were violating La. R.S. 32:24(B)(2) each time they ran through a red traffic light without slowing down and at 80 to 100 mph, constitutes a question of fact not suitable for Rule 12(b)(6) dismissal.

In conclusion, as observed by the district court in *McGowan*, misusing a police vehicle in a manner that virtually assures someone will be killed in an intersectional collision is not dissimilar from indiscriminately firing a gun. Each time the BRPD officers and Officer Cauthron misused their vehicle by running a red traffic light without slowing down and at excessive speeds was like taking turns pulling the trigger of the gun. Yet, the City/Parish's argument is basically that, even though the BRPD officers actively participated in the group and concerted effort to arrest Zanders and started the pulling of the trigger, Officer Cauthron pulled the trigger when it eventually struck someone, so the City/Parish is not liable, despite participating in the same dangerous activity that caused the damages. This is not the law of joint and several liability for police officers involved in a Constitutional violation. The BRPD officers participated in the group and concerted effort to arrest Zanders and violated La. R.S. 32:24(B)(2) and the official BRPD Pursuit Policy, accepting joint and several liability for damages resulting from the eventual Constitutional violation.

## II. The Gills Stated a Plausible Claim that the BRPD's Lack of Training, Supervision, and Discipline, and Ratification of Its Officers' Actions Constituted the Moving Force Leading to the Reckless Driving Practices that Killed Caroline Gill.

### A. Municipalities Become Independently Liable for an Officer's Constitutional Violation Resulting from a Departmental Policy or Custom.

Plaintiffs do not allege that Caroline Gill's death resulted from a duly promulgated policy statement, ordinance, or regulation of the policymaker. To the contrary, plaintiffs maintain that Caroline Gill would still be alive today if the police officers had followed La. R.S. 32:24(B)(2) and the BRPD Pursuit Policy. Rather, as in *McGowan*, *supra*, plaintiffs alleged that Caroline Gill's death resulted from the BRPD's departmental custom and practice of knowingly and purposefully violating La. R.S. 32:24(B)(2) and the BRPD Pursuit Policy during pursuits. Plaintiffs alleged that this departmental custom and practice became the moving force behind the plaintiff's constitutional violation. *Piotrowski*, 237 F.3d at 580 (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018) ("In other words, a plaintiff must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009).[7] A municipality may become liable for the constitutional violations of its officers if the supervisory officials or policymakers demonstrate a deliberate indifference to constitutionally protected rights.[8] Deliberate indifference may be demonstrated through one of three ways: (1) failure to train, (2) failure to discipline or supervise, and (3) ratification of the officer's conduct.

---

[7] Accordingly, to succeed on a *Monell* claim against a municipality, a plaintiff must establish three elements: (1) an official policy or custom; (2) of which a policy maker can be charged with actual or constructive knowledge; and (3) a constitutional violation whose moving force is that policy or custom. *Valle v. City of Houston*, 613 F.3d 536, 541-42 (5th Cir. 2010); *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009); *Hicks–Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017); and *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.2001). The elements of the *Monell* test exist to prevent a collapse of the municipal liability inquiry into a respondeat superior analysis. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 415, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). A municipality may not be subject to liability merely for employing a tortfeasor. *See, e.g., City of Canton, Ohio v. Harris*, 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

[8] Deliberate indifference is "more blameworthy than negligence" but less blameworthy than purposeful harm. *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). *See also Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010) ("Deliberate indifference is more than mere negligence."). It is "a stringent

### B. Failing to Train

"A municipality's decision not to train or supervise its employees about their legal duty to avoid violating citizens' rights may rise to the level of an official policy for purposes of Section 1983."[9] *Bailey v. Ramos*, 657 F.Supp.3d 927, (W.D. Tex. 2/17/23); citing *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "A municipality's failure to train its police officers can without question give rise to § 1983 liability." *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009) (citations omitted) When a municipal entity enacts a facially valid policy, such as the BRPD Pursuit Policy, but fails to train its employees to implement it in a constitutional manner, that failure constitutes official policy that can support municipal liability if it amounts to deliberate indifference. *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) (quoting *Canton*, 489 U.S. at 388, 109 S.Ct. 1197).

To prevail on a theory of failure to train, the plaintiff must plead facts plausibly establishing "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question." *Bledsoe v. Willis*, --- F.Supp.3d ---, 2023 WL 2987888 (W.D. La. 3/30/23); *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010); *Ratliff v. Aransas County, Texas*, 938 F.3d 281, 285 (5th Cir. 1/15/20); *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) "[C]ourts should only require 'minimal factual allegations' about the training programs at the pleading stage, since 'it is exceedingly rare that a plaintiff will have access to (or

---

standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61, 131 S.Ct. 1350; *Southard v. Tex. Bd. of Crim. Justice*, 114 F.3d 539, 551 (5th Cir. 1997).

[9] "It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that, in light of the duties assigned to specific officers or employees, the need for more, or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be liable if it actually causes injury." See *City of Canton v. Harris*, 489 U.S. 378 (1989).

personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery.'" *Thomas*, 800 F. Supp. 2d at 842–43.

At the pleading stage, "Claims of inadequate training generally require that the plaintiff demonstrate a pattern." *Lafleur v. Leglue,* 2018 WL 4365516 (M.D. La. 2018), *2; *citing Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5ᵗʰ Cir. 2010). The acts must be, "[F]airly similar to what ultimately transpired and, in the case of excessive use of force, that the prior act must have involved injury to a third party." *Rice v. Reliastar Life Inc. Co.,* 2011 WL 1168520, *4 fn. 1; *citing Sanders-Burns, Id*. at 381 Only where a failure to train reflects a deliberate or conscious choice by the municipality can the failure be properly thought of as an actionable city policy. *City of Canton*, 489 U.S. at 379. Moreover, the identified deficiency in the training program must be closely related to the ultimate injury. *Id*. Thus, the plaintiff must allege that the deficiency in training caused the officers' indifference to constitutional rights. *Id*.[10]

Alternatively, deliberate indifference can be shown by, "[S]howing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights." *Id*. at 372. "An injury is 'highly predictable' where the municipality 'fail[s] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face.'" *Hankins*, 2022 WL 2208848, at *7 (quoting *Hutcheson v. Dallas Cty., Tex.*, 994 F.3d 477, 482-83 (5ᵗʰ Cir. 2021)). Thus, when a constitutional violation

---

[10] A plaintiff must establish that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonable be said to have been deliberately indifferent to the need." *Sanders-Burns, Id*. at 381. When a municipality's policymakers are on actual or constructive notice that a particular omission in their training program causes municipal employees to violate citizens' constitutional rights, the municipality may be deemed deliberately indifferent if the policymakers choose to retain that program. *Connick*, 563 U.S. at 61, 131 S.Ct. 1350. *See also Brown v. Bryan Cnty., OK*, 219 F.3d 450, 459 (5th Cir. 2000) (Thus, when the city arms its officers to carry out this task [arrest fleeing felons], there is thus the obvious need to train officers in the constitutional limitations on the use of deadly force. This need for training is so obvious that the failure to train is deliberate indifference to constitutional rights.")

results as the highly predictable consequence of a municipality's failure to properly hire, train, supervise, or discipline, the failure can amount to deliberate indifference. *Robles v. Ciarletta*, 797 F. App'x 821, 833–34 (5th Cir. 2019).

## C. Failing to Supervise and Discipline

To establish *Monell* liability for a failure supervise and discipline, "it must have been obvious that the highly predictable consequence of not supervising was that they would" commit the specific constitutional violation alleged. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009). A failure to supervise or discipline requires a showing that "a pattern of similar [constitutional violations] went ignored." *Hegeman v. Harrison*, 2019 WL 1277523, at *12 (E.D. La. Mar. 20, 2019). A policy of failing to discipline officers can be established by alleging "a persistent, widespread practice of [ ] officials or employees, which ... is so common and well-settled as to constitute a custom that fairly represents municipal policy." *See Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (*quoting Webster*, 735 F.2d at 841) ("it is nearly impossible to impute lax disciplinary policy to the City without showing a pattern of abuses that transcends the error made in a single case"); *accord Fraire v. City of Arlington*, 957 F.2d 1268, 1278–79 (5th Cir. 1992) ("[A] city's custom or policy authorizing or encouraging police misconduct cannot be inferred from a municipality's isolated decision not to discipline a single officer for a single incident of illegality.") The plaintiff must demonstrate that similar unconstitutional acts "have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow*, 614 F.3d at 169 (*citing Webster*, 735 F.2d at 842).

## D. Ratification of the Officer's Conduct

The United States Supreme Court has held that if "authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the

municipality because their decision is final." *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009) (*citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 127). However, good faith statements made in defending complaints against municipal employees do not demonstrate ratification. *See Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 852 (5th Cir.2009). A "policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Id*. at 848 (citing *Coon v. Ledbetter*, 780 F.2d 1158, 1161–62 (5th Cir.1986)). To support a supervisory liability claim, the misconduct of a subordinate must be linked to the action or inaction of the supervisor. *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir.1994) (en banc). The theory of ratification has been limited to "extreme factual situations." *Id*. (citing *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848, (5th Cir. 2009)). Unless the subordinate's actions are sufficiently extreme, *i.e.*, conscience-shocking behavior in violation of established policy, a policymaker's ratification or defense of his subordinate's actions is insufficient to establish an official policy or custom. *Id*. (*citing Peterson*, 588 F.3d at 848; *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 170 (5th Cir.1985)).

For example, in *Grandstaff v. City of Borger, Tex*, *supra*, an innocent bystander approached police officers who had chased a suspect onto the bystander's property. When the bystander reached the patrol cars, multiple officers opened fire on his vehicle, killing him. The Fifth Circuit characterized the officers' group response and killing of the bystander as an "incompetent and catastrophic performance, [and] there were no reprimands, no discharges, and no admissions of error." *Id*. at 171. The court concluded that the, "[R]eaction to so gross an abuse of the use of the deadly weapons says more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers employed excessive force." Thus, the Fifth Circuit in

*Grandstaff* found the officers' actions sufficiently extreme and conscience-shocking to implicate liability by ratification of the policy violations, even in the absence of a pattern of conduct.

### E. The *McGowan* Court Examined the County of Kern's Monell Liability for Its Alleged Departmental Custom and Practices of Either Failing to Adequately Train or Permitting Its Deputies to Regularly Drive at Excessive Speeds.

The federal district court in *McGowan, supra,* examined the futility of plaintiff's *Monell* claim against the County of Kern for Deputy Clerico's killing of Ms. Garrett. The court noted plaintiff's allegations citing to the county's post-accident investigation and audit results: deputies routinely drove at excessive speeds while responding to calls and otherwise; the deputies were regularly involved in numerous on-duty vehicle collisions every year; that approximately half the time the deputies were at-fault; and that the county was aware of the dangers presented by these collisions. The district court noted that one deputy struck and killed two pedestrians while travelling at an excessive rate of speed with his patrol car in 2011, three years prior to Ms. Garrett's death, yet took no action. The district court further noted the county's ability to monitor and audit the speeds of its deputies, yet failed to do so. Despite frequent vehicular accidents, only six (6) deputies were ever disciplined for driving at excessive speeds in nine years, and the discipline imposed was minimal. Accordingly, the district court held that:

> These allegations, if proven, plausibly support and inference that the County of Kern had a policy or custom of either failing to adequately train or permitting the sheriff's deputies to regularly drive at excessive speeds, that this manner of driving frequently caused traffic collisions, that such collisions could be and sometimes were fatal, and that the County was deliberately indifferent to the serious risk of these fatalities.

For these reasons, the court held that the plaintiff's proposed amendment to state a *Monell* claim premised on Kern County's departmental customs was not futile. *Id*. at \*13.

### F. The Gills Stated a Plausible Claim that the BRPD Developed a Custom and Practice of Deliberate Indifference to Abiding the Statutory Mandates of La. R.S. 32:24(B)(2) and the Official BRPD Pursuit Policy.

As previously discussed, when pleading a Monell claim, the district courts require minimal factual allegations about training programs at the pleading stage, since it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery. The Gills are certainly not the exception to the general rule. The Gills do not have access to or personal knowledge of specific details regarding the BRPD's internal training policies and procedures prior to discovery. Nonetheless, the Gills' initial research uncovered disturbing facts regarding the BRPD's pattern of vehicular accidents involving pursuits, a pattern of lack of supervision and discipline, and the bad faith ratification of its officers' conduct before and after the death of Caroline Gill.

From 2013 to 2023, the BRPD engaged in approximately 1,200 pursuits, on average about one every three days. Despite eighty-three percent (83%) of pursuits initiated over nonviolent crimes, the BRPD supervisors recorded only six (6) violations of the BRPD Pursuit Policy, and despite ten percent (10%) of all pursuits ending in crashes. (Sec. Comp., p. 38, ¶ 106) For example, from 2016 to 2022, about eleven percent (11%) of all BRPD pursuits ended in a crash, or 101 out of 926 in total. (p. 35, ¶ 95) Nevertheless, the BRPD encouraged high-speed pursuits by routinely praising and ratifing its patrol officers' conduct. (p. 38, ¶ 107) The BRPD voluntarily terminated pursuits in only 6% of the 156 pursuits in 2022, the year Caroline Gill died. (p. 35, ¶ 95)

In comparison to the three bystanders who died from police pursuits in the *McGowan* decision, upon information and belief, seven individuals have died in BRPD pursuits in only two years: four people in 2021, two people in 2022, and one person in 2023. (p. 9, ¶ 26) BRPD policymakers were aware of the frequency of pursuits, probability and frequency of collisions, and the clear dangers to life well before Caroline Gill and Margaret Dunn's deaths. For example, upon information and belief, the relatives of Caleb Chappetta and Victor Duncan, Sr. did file suit against

the City/Parish for BRPD's role in the respective deaths that occurred during pursuits with the BRPD. (¶ 108-109)

Moreover, the actions of the BRPD officers in this case demonstrate the possibility of the same conduct in recurring situations that present an obvious potential for violation of constitutional rights. Future injuries from automobile accidents become highly predictable where BRPD officers demonstrate a willful refusal to follow the statutory requirements of La. R.S. 32:24(B)(2) and the BRPD Pursuit Policy. The BRPD officers did not report Zanders' traffic violations, as required for BRPD supervisors to decide on whether to terminate the chase. (p. 35, ¶ 95) The officers chased Zanders throughout West Baton Rouge Parish, beyond their jurisdictional boundary and in violation of the two officer limit. (p. 33, ¶ 90) The five BRPD officers ran no less than three red traffic lights without slowing down and at speeds between 80 to 100 mph.

The BRPD's actions further infer a likely pattern of failing to supervise and discipline its officers for clear violations of the BRPD Pursuit Policy. For example, in *McGowan*, for a period of nine years, the sheriff's office disciplined six (6) sheriff's deputies for excessive speeds, and the discipline primarily consisted of reprimands, remedial trainings involving self-study and a short quiz, and brief suspensions. Similarly, the BRPD also recorded only six (6) policy violations over a ten-year period with over 1,200 pursuits. (p. 38, ¶ 106) The Gills do not possess the disciplinary records to plead with specificity the severity of discipline imposed in those six limited instances of disciplinary action.

Furthermore, the BRPD Internal Affairs Committee actions in this case are clearly consistent with the above historical trend. Despite numerous violations of La. R.S. 32:24(B)(2) and the BRPD Pursuit Policy, the BRPD issued no disciplinary actions in this case, finding that the officers "did not commit egregious BRPD policy violations." (p. 32, ¶ 88) The Court should

consider that, apparently, the only violation of the BRPD Pursuit Policy egregious enough to warrant disciplinary action involves an officer running a red light at high speed and actually killing a bystander with the police vehicle. (p. 34, ¶ 94, p. 39, ¶ 108)

Further demonstrating its deliberate indifference to following official departmental policy, the BRPD administrators ratified the officers' gross violations of the BRPD Pursuit Policy. The BRPD policymakers engaged in a bad faith public cover-up of their officers' actions. To distance itself from the deaths of Caroline Gill and Margaret Dunn, BRPD officials initially told reporters with The Advocate that its officers terminated the high-speed chase of Zanders once the officers crossed into West Baton Rouge Parish. (p. 32, ¶ 89) However, BRPD spokespersons later recanted their initial false statements once videos obtained by the WBRSO demonstrated that the five BRPD officers led the group's active pursuit of Zanders throughout West Baton Rouge Parish and until such time as Zanders arbitrarily U-turned in the median and Officer Cauthron took the lead. (Id.) As in *Grandstaff*, *supra*, the BRPD's reaction and cover-up for its officers' violations of La. R.S. 32:24(B)(2) and the BRPD Pursuit Policy says more about the disposition of the current BRPD policymakers than would a dozen similar incidents.

These facts and statistics collectively and reasonably infer at the pleading stage a pattern of conduct consistent with a departmental custom and practice of knowingly and willfully refusing to follow La. R.S. 32:24(B)(2) and the BRPD Pursuit Policy. The BRPD's infrequency of voluntary pursuit terminations, lack of discipline, frequency of collisions, number of deaths, and violations of the BRPD Pursuit Policy infers a pattern of conduct consistent with a lack of training and/or a departmental custom and practice of violating said policy with impunity. Like *McGowan*, the frequency of accidents without corresponding disciplinary action infers a plausible pattern of deliberate indifference to the Constitutional rights of its citizens.

Contrary to the arguments presented by the City/Parish, the Gills were not legally required to allege at the pleading stage the following: the crimes that led to these pursuits, the number of officers involved, the number of criminals not pursued, the severity of each crash, the circumstances of each crash, the justification for each pursuit, or engage in wholesale speculation as to the life and property saved by apprehending fleeing criminals. (City/Parish Memo., p. 9) Nonetheless, the Gills can confidently state that the facts and statistics alleged against the BRPD exceed the pattern of accidents and deaths alleged in *McGowan*, where the district court found that plaintiffs stated a Monell claim against the County of Kern. And just like instances of driving misconduct fell after the County of Kern took active measures to train and discipline its officers, the City/Parish and the BRPD will train and discipline its officers to follow the requirements of La. R.S. 32:24(B)(2) and the BRPD Pursuit Policy, once the City/Parish is held accountable for the department's custom and practice of ignoring statutes, policy, and parameters.

In conclusion, the Gills alleged frequent vehicular collisions occurring during pursuits, multiple fatalities resulting from pursuits, gross violations of La. R.S. 32:24(B)(2) and the BRPD Pursuit Policy, limited instances of supervision and discipline, and a bad faith cover-up and ratification of its officers' role in the deaths of Margaret Dunn and Caroline Gill. If proven, these allegations plausibly infer that the BRPD has a departmental custom and practice of failing to adequately train or permitting its officers to willfully violate statutes, official policy, and parameters. The City/Parish's supporting memorandum epitomizes the BRPD's callous and deliberate indifference to its officers abiding by statutes, policy, and parameters, which ultimately led of the deaths of Caroline Gill and Margaret Dunn ("There are parameters in place for the actions that can be taken by police officers in pursuit of fleeing motorists. Sometimes those parameters are exceeded, and accidents happen."). (City/Parish Memo., p. 9)

## CONCLUSION

La. R.S. 32:24(B)(2) and the BRPD Pursuit Policy were enacted to protect the general public from harms that can occur during pursuits of fleeing suspects. Contrary to the City/Parish's argument, BRPD officers do not have *carte blanche* authority to exceed the statutory and official policy parameters. Yet, because the BRPD has developed a custom and practice that allows its officers to willfully exceed these parameters with impunity, and without fear of any meaningful disciplinary action, accidents regularly happen; accidents will continue to happen; and innocent bystanders will continue to lose their lives. As in *McGowan*, the BRPD's deliberate indifference serves as the moving force for its officers' dangerous driving practices.

For the foregoing reasons, the Gills respectfully pray for the Court to deny the motion to dismiss filed by the City/Parish. The Gills pled the minimal factual allegations necessary to place the City/Parish on notice of plaintiffs' custom and practice claim. The Gills sufficiently alleged that the BRPD's custom and practice of willfully and intentionally violating the BRPD Pursuit Policy and La. R.S. 32:24(B)(2) and actual knowledge of said custom and practice operated to serve as the moving force that started the extremely dangerous driving practices that ultimately led to Margaret Dunn and Caroline Gill's death on December 31, 2022.

Respectfully Submitted:
**Melancon, Rimes, & Daquanno**

**Jason L. Melancon, La. Bar No. 28152**
**Robert C. Rimes, La. Bar No. 28740**
**R. Lee Daquanno, Jr., La. Bar No. 36430**
6700 Jefferson Hwy., Bldg. 6 (70806)
P.O. Box 82859
Baton Rouge, LA 70884
Telephone: (225) 303-0455
Facsimile: (225) 303-0459
Email: jason@melanconrimes.com

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

JASON PAUL GILL AND        CASE NO. 23-CV-1618
KIMBERLY ELLIOTT

       JUDGE BRIAN A. JACKSON

VERSUS

       MAGISTRATE
DAVID LEE CAUTHRON, ET AL.        ERIN WILDER-DOOMES

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing was this date sent to all counsel of record by electronic mail to the email address listed with the Court's electronic filing system, facsimile, and/or U.S. mail, postage prepaid and properly addressed. Notice will be mailed to any party or counsel not participating in the Court's CM/ECF system by this date depositing same in the United States Mail, postage prepaid and properly addressed.

Signed in Baton Rouge, Louisiana this 17th day of May, 2024.

_____
Jason L. Melancon