UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JASON PAUL GILL, ET AL.                               CIVIL ACTION

VERSUS

DAVID LEE CAUTHRON, ET AL.                    NO. 23-01618-BAJ-EWD

RULING AND ORDER

On December 31, 2022, Defendant David Lee Cauthron, then an employee of the Addis Police Department ("APD"), killed Caroline Gill and Maggie Dunn during a high-speed pursuit of an alleged car thief. Caroline was fifteen years old. Maggie was seventeen years old. The family of Caroline Gill brings this action on her behalf.

Now before the Court is Defendant City of Baton Rouge/Parish of East Baton Rouge's **Motion To Dismiss (Doc. 36, the "Motion")**. The Motion is opposed. (Doc. 40). For reasons that follow, the Motion will be granted.

I.   FACTUAL BACKGROUND

For present purposes, the following facts are taken as true:

On December 31, 2022, at 12:30 PM, Caroline Gill and Maggie Dunn were killed in a vehicular collision with Cauthron. (Doc. 33 at 2). Liam Dunn, Caroline's friend, was also in the vehicle. Liam was twenty years old at the time of the collision, and was seriously injured. (*Id.*).

The accident was caused by Cauthron, who, while engaged in a police pursuit, accelerated through a red light at approximately 86 miles per hour. (*Id.* at 3). The light was red for approximately eleven seconds before Cauthron proceeded through the intersection. (*Id.* at 4). He observed multiple persons crossing this intersection,

yet never engaged his breaks. (*Id.*). Apparently fully aware of the certain harm that his actions would cause, he exclaimed, "THIS IS GOING TO HURT," while continuing to proceed at a dangerously high rate of speed. (*Id.*). Cauthron made this utterance eight seconds before he entered the intersection.[1] (*Id.*).

The police chase that claimed the lives of Caroline Gill and Maggie Dunn had a mundane origin. On the date in question, Tyquel Zanders, then twenty-four years old, took his father's vehicle without authorization. (*Id.* at 9). The Baton Rouge Police Department ("BRPD"), an arm of the City of Baton Rouge/Parish of East Baton Rouge (the "City/Parish"), was notified by Zanders's family, and initiated the aforementioned high-speed chase within Baton Rouge city limits. (*Id.*).

BRPD police chases are governed by General Order No. 136 ("BRPD Pursuit Policy"). The BRPD Pursuit Policy states that:

> (1) no more than two units shall engage in a chase; (2) chases will be immediately terminated whenever the person being pursued can be positively identified and there is no longer a need for immediate apprehension; (3) the chase shall conclude where the immediate danger to the public created by the pursuit is less than the immediate or potential danger should the public remain at large; and (4) the determination should be based on whether the suspect's identity is known, what violation they committed, and the amount of traffic in the area, location, and time of day.

(*Id.* at 9).

Zanders's crime, unauthorized use of his father's vehicle, is a grade 3 infraction, and did not involve any need for immediate apprehension. (*Id.*). After BRPD officers initiated the chase, the dangers imposed on the public heightened, as

---

[1] The utterance was captured by audio recording devices located in Cauthron's vehicle or on Cauthron's person. (Doc. 33 at 12).

Zanders began swerving into oncoming lanes of traffic, reached speeds of 80 miles per hour, and nearly struck a civilian. (*Id.* at 10). Five BRPD patrol units, already in excess of the departmental limit, chased Zanders beyond their jurisdiction and into West Baton Rouge Parish, where Cauthron and APD joined the fray. (*Id.*).

BRPD called West Baton Rouge Parish to notify them of the pursuit via phone call, yet in this call failed to mention: (1) that BRPD knew Zander's identity, and (2) the actual violation Zanders was being pursued for. (*Id.* at 31). All the while, BRPD officers ran red lights without slowing down, drove onto the shoulder to pass stationary vehicles, and forced bystander motorists into the median. (*Id.* at 10). The BRPD officers' actions were plainly against the BRPD Pursuit Policy, which clearly instructed officers that "when approaching an intersection controlled by a stop sign or red light, officers should slow their vehicle to a speed considered reasonable and which would allow them to bring their vehicle to a complete stop if necessary." (*Id.*).

APD has its own pursuit policy (the "Addis Pursuit Policy") that is duplicative of the BRPD Pursuit Policy. Despite these policies, BRPD and APD officers exceeded speeds of ***100 miles per hour***, during the middle of the day and in high traffic areas. (*Id.* at 11).

At some point during the chase, Cauthron became the nearest responding officer to Zanders. (*Id.*). Zanders ran a red light on La. 1, despite other motorists beginning to proceed across the intersection. (*Id.*). Officer Tim Gilbert of the Brusly Police Department was following Cauthron at the time of the collision, and stated that as they were approaching the intersection in question, he believed Cauthron

3

would slow down given the red light and visible crossing traffic. (*Id.*). Gilbert slowed his vehicle, while Cauthron did not. Gilbert stated that at no time did he see Cauthron's brake lights activate prior to his proceeding across the busy intersection. (*Id.* at 12).

A BRPD Accident Reconstruction Expert, Lt. James Pittman, investigated the accident. (*Id.*). He found that "Officer Cauthron was driving in a reckless manner while in pursuit of a vehicle without regard for other motorists on the highway." (*Id.*). Cauthron "observed the potential hazard [the red light and crossing motorists] ahead 11 seconds before reaching the intersection." (*Id.*). He "had time and distance to slow his police vehicle and safely pass through the intersection." (*Id.* at 12-13). "Had he began breaking three seconds later when he said, 'THIS IS GOING TO HURT,' he could have applied a relatively normal breaking application and stopped at the intersection." (*Id.* at 13). Cauthron did not, and his actions cost the lives of two teenagers, along with permanent and debilitating injuries to Liam Dunn. (*Id.*).

La. R.S. 32:24(B)(2) provides that authorized emergency vehicles may proceed past a red or stop signal or stop sign, but "only after slowing down or stopping as may be necessary for safe operation." Evidently, Cauthron failed to abide by this statute. Cauthron kept the accelerator to the floor of his vehicle prior to, during, and after the collision. (Doc. 33 at 13). It is Plaintiffs' contention that Cauthron's actions are symptoms of a broader disease prevalent in the APD and BRPD, that of the "need to win" any police chase—consequences and innocent lives be damned. (*Id.* at 14).

4

Since this time, Cauthron has been pled guilty to two counts of manslaughter, and one count of negligent injury. (*Id.*).

Members of the APD have operated their vehicles in haphazard fashion before. (*Id.* at 5). In 2017, dashcam footage of APD officers was publicized wherein officers were running red lights without slowing down, driving into oncoming traffic, driving on the shoulders at high speed, and crossing over medians. (*Id.*). Police Chief Richard Anderson, reacting to this viral footage on Facebook, stated, "If you don't run, there won't be an accident." (*Id.* at 6). Plaintiffs point to this statement as support for the argument that Anderson places pressure on his officers to arrest all fleeing subjects no matter the circumstance. (*Id.* at 14).

Plaintiffs allege that the BRPD has also tacitly authorized its officers' unresponsible driving practices. An internal affairs committee report was commissioned for the accident that claimed the lives of Caroline Gill and Maggie Dunn was conducted. (*Id.* at 32). There, the committee opined that, despite the factual allegations levied above, BRPD officers committed no egregious policy violations. (*Id.*).

The BRPD's stance was echoed by its public statements to The Advocate, a local newspaper, after the December 31 crash. (*Id.* at 33). There, the BRPD stated that BRPD officers terminated their chase once Zanders proceeded into West Baton Rouge Parish. (*Id.*). This statement was not true, and the BRPD later recanted. (*Id.*).[2]

---

[2] The falsity of BRPD's statements were revealed after the West Baton Rouge Sherriff's Office released an investigative report containing dashcam and surveillance footage that showed five BRPD units participating in the chase through West Baton Rouge Parish.

5

Nevertheless, the BRPD's conclusion that its officers committed no egregious policy violations remained. (*Id.*).

In addition, Plaintiffs allege that the BRPD has been involved in other fatal police chases in the past several years. (*Id.* at 34). Plaintiffs assert that in October 2023, a BRPD patrol unit engaged in a pursuit ran a red light without slowing down, and that this action caused a collision which killed a bystander motorist. (*Id.*). Similarly, in January 2024, another lawsuit was filed against BRPD, alleging that one of its officers ran a red light and killed a minor. (*Id.* at 39). One month later, the surviving children of another victim who was killed by a BRPD officer running a red light also brought suit. (*Id.*).

These anecdotes are allegedly corroborated by statistics. (*Id.* at 35). Plaintiffs allege that of the 156 vehicle chases conducted by BRPD in 2022, only 6% were voluntarily terminated. (*Id.*). In 2021, four people died in vehicle crashes involving the BRPD, and from 2016 to 2022, approximately one in every nine BRPD chases ended in a crash, for a total of 101 crashes. (*Id.*). Moreover, from 2013 to 2023, the BRPD engaged in approximately 1,200 pursuits, 83% of which were initiated over nonviolent crimes. (*Id.* at 38). During this time period, BRPD found only *six* violations of the BRPD Pursuit Policy, despite approximately 10% of all pursuits ending in crashes. (*Id.*).

The severity of the risks imposed by the police chases, as they are currently conducted, has been identified by Louisiana state legislators. (*Id.* at 14). State Representative Edmond Jordan, a Brusly area representative, has proposed new

state legislation for regulating police chases in Louisiana due to climbing casualties. (*Id.*). According to Representative Jordan, the issue with police chases lies in the lack of training and accountability for police officers. (*Id.*).

## II. PROCEDURAL HISTORY

On April 18, 2024, Plaintiffs filed their Second Amended Complaint, setting forth the factual allegations outlined above and bringing claims for state law negligence, federal due process and excessive force claims under 42 U.S.C. § 1983, and *Monell* claims against both the town of Addis through the APD and the City/Parish through the BRPD. (Doc. 33).

The City/Parish has now filed its Motion to Dismiss. (Doc. 36). In it, the City/Parish argues that the Court: (1) should dismiss Plaintiffs' claim for inadequate training of its officers due to issues of causation and a lack of supporting factual allegations, (2) should dismiss Plaintiffs' *Monell* claim for the City/Parish's alleged unwritten *de facto* policy or custom concerning police chases, and (3) should dismiss Plaintiffs' state-law negligence claims for the same issues of causation. (Doc. 36-1). Plaintiffs oppose the Motion. (Doc. 40).

## III. LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). When conducting its inquiry, the Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quotation marks omitted).

## IV. DISCUSSION

Having considered each Party's briefing, the Court concludes that Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted against the City/Parish, and such claims will be dismissed. Because the Court dismisses Plaintiffs' federal claims against the City/Parish, the Court will also decline to exercise jurisdiction over Plaintiffs' state law claims against the same.

### a. Failure to Train and/or *Monell* Policy Claim

The Parties do not contest the applicable law. To adequately plead a failure-to-train claim against a municipality, a plaintiff must plead facts plausibly establishing "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3)

that the inadequate training policy directly caused the violations in question." *Ratliff v. Aransas Cnty., Texas*, 948 F.3d 281, 285 (5th Cir. 2020) (quoting *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010)).

Plaintiffs at this stage must provide "only minimal factual allegations" in support of their failure-to-train claim, because it is "exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d 826, 842-843 (S.D. Tex. 2011). This minimal threshold can be met by demonstrating a pattern of similar conduct. *Hobart v. City of Stafford*, No. 4:09-CV-3332, 2010 WL 3894112, at *5 (S.D. Tex. Sept. 29, 2010) (collecting cases).

Plaintiffs may show deliberate indifference by demonstrating "either that (a) the 'municipality had notice of a pattern of similar violations,' or (b) 'the constitutional violation was the highly predictable consequence of a particular failure to train.'" *Armstrong v. Ashley*, 60 F.4th 262, 277 (5th Cir. 2023) (quoting *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 396 (5th Cir. 2017).

For a general *Monell* claim, Plaintiffs must identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)). This third prong mirrors the analysis for a failure-to-train claim, and requires that plaintiffs demonstrate

"deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision" and a "direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 542 (quoting *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). To this end, "the standard for establishing liability for failure to train is the same standard for establishing municipal liability in general." *Id.* at 544 (citing *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005)).

Here, were the Court to end its analysis on the initial prongs of Plaintiffs' claims concerning the City/Parish's failure to train and/or policy of allowing BRPD officers to operate recklessly in police chases, Plaintiffs' allegations would more than suffice.

Taking Plaintiffs' allegations as fact, the City/Parish has an obvious problem that is costing innocent lives. BRPD officers in this instance *repeatedly* flouted the BRPD Pursuit Policy, and yet seemingly faced no repercussions. (*See* Doc. 33 at 26, 32). Compounding this failure, and as discussed *supra*, the BRPD gave the public false information that had the effect of temporarily obfuscating its officers' involvement in the fatal car chase. (*Id.* at 33).

Moving past this specific incident and on to general trends, as the Court has previously explained, Plaintiffs have alleged that, from 2013 to 2023, the BRPD has recorded only six violations to the BRPD Pursuit Policy. (*Id.* at 38). In that span, there were over 1,200 pursuits, the vast majority of which were for nonviolent crimes, and a whopping 10% of such pursuits ended in crashes. (*Id.*). That BRPD officers have

committed a mere six violations over the course of a decade, given the number of pursuits, the cause of these pursuits, and the resulting crashes, simply strains credulity. The BRPD's more recent history supports the Court's disbelief. In 2021 alone, four people died in vehicle chases involving the BRPD. (*Id.* at 35). In January 2024, an adolescent was killed after a BRPD officer recklessly ran through a red light without slowing down. (*Id.* at 39). The officer there, as with Cauthron here, is facing criminal charges.

In sum, Plaintiffs have: (1) pointed to other instances of BRPD officers recklessly operating their vehicles in police chases, (2) provided materials indicating that BRPD officers generally do not abide by the BRPD Pursuit Policy, (3) shown how the City/Parish ratified its officers' misconduct in this instance, and (4) given statistics supporting an inference that refusal to hold officers accountable has been the BRPD's longstanding practice or policy. (*Id.* at 9, 35, 38-39). The facts as alleged above, and provided in greater detail in Part I of this Ruling and Order, show that it is more than merely plausible that BRPD inadequately trains its officers for police chases and/or maintains a *de facto* policy of not holding its officers accountable for their related misconduct. Moreover, these same facts easily allow for the reasonable inference that the City/Parish has been deliberately indifference in these failures.

Suffice it to say, it is, in the Court's opinion, not for a lack of culpability that the City/Parish avoids liability here. Rather, it is because, despite Plaintiffs' novel arguments concerning causation, the Court reluctantly concludes that the causal

chain is simply too attenuated to hold the City/Parish accountable for the acts of another municipality's employee.

To hold the City/Parish accountable, its failures must be the "direct" or "moving cause" of the injury. *See Valle*, 613 F.3d at 541; *see Ratliff*, 948 F.3d at 285. Plaintiffs argue that the City/Parish may be held accountable for the actions of Cauthron, an ADP officer, because: (1) the pursuit of Zanders was initiated by BRPD, (2) this pursuit continued past the BRPD's jurisdictional limits, and (3) Cauthron was "influenced" and "emboldened" by the alleged reckless acts of responding BRPD officers. (*Id.* at 31). Plaintiffs thus seek to hold the City/Parish accountable for failing to train and/or supervise and discipline its officers because this failure caused its officers to operate their vehicles recklessly in the chase of Zanders, and the operation of BRPD vehicles in this manner then caused Cauthron, who was neither employed nor trained by BRPD, to behave in a similar manner.

The Court concludes that this theory does not allow for the plausible inference that the City/Parish's failures were the direct or moving cause for Cauthron's actions. Plaintiffs' claims that BRPD officers influenced and emboldened Cauthron are, at core, speculative conclusions in that they credit the BRPD with Cauthron's misconduct without specific factual allegations in support. (*See id.* at 31). Such allegations do not survive a motion to dismiss. *Am. Biocarbon, LLC v. Keating*, No. CV 20-00259-BAJ-EWD, 2020 WL 7264459, at *3 (M.D. La. Dec. 10, 2020). The Court reaches a similar conclusion with regard to Plaintiffs' argument concerning BRPD officers continuing the chase beyond their jurisdictional limits. Such a decision, to the

extent it is contrary to the BRPD Pursuit Policy and is an outgrowth of the City/Parish's failure to train and/or *de facto* policy, does not support an inference that the BRPD officers' collective decision to continue the chase was the moving force behind Cauthron's misconduct.

Plaintiffs argue that the Court may hold the City/Parish responsible for the actions of the BRPD for reasons of joint and several liability. Plaintiffs contend that BRPD officers were willing participants in the overall course of conduct that led to the tragic deaths of Maggie Dunn and Caroline Gill, and that in light of this participation the issue of causation must be placed in the hands of the jury. (Doc. 40 at 12). In support of this, Plaintiffs have provided several decisions wherein police officers were held joint and severally liable for their contribution to a particular injury. (*Id.* at 11-12).

Plaintiffs point to the case of *Richman v. Sheahan*, 512 F.3d 876 (7th Cir. 2008), to show that in various instances police officers may be jointly and severally liable, such as where: (1) "each defendant's act makes the injury to the plaintiff a little worse and it is the combination of the acts of separate defendants that does him in," (2) "each defendant might by his own act have inflicted the entire injury. . . as when two persons shoot a third and each wound would have been fatal by itself," (3) "each defendant might have committed an act that is a tort when injury results. . . but it is unclear which defendant's act was the one that inflicted the injury," and (4) "one defendant might commit the act that causes the harm yet the other be sued as well because he could have prevented the harm but did not." *Richman*, 512 F.3d at

884-885. However, none of these situations apply to the case at bar. It is unquestioned that only Cauthron struck Plaintiffs' decedent's vehicle, and there are no factual allegations that responding BRPD officers could have somehow prevented Cauthron from choosing to run through a red. Moreover, unlike the prolonged encounter in *Richman*, Cauthron's decision to enter the intersection at a high rate of speed did not become apparent until he was on the verge of doing so, at which time he was moving at a high rate of speed at a significant distance in front of the responding BRPD officers. (Doc. 33 at 12).[3]

Plaintiffs' other caselaw fares no better. *Nesmith v. H.D. Alford*, 318 F.2d 110 (5th Cir. 1963), held that three defendants could be jointly liable for the wrongful arrest and imprisonment of plaintiffs. However, these three defendants were in hierarchical relationships with one another by virtue of an unbroken chain of command, and were determined to have "acted as one" in causing the complained-of injury. *Id.* at 119. There are no such allegations here. Cauthron possessed no relationship with BRPD, and, while BRPD officers allegedly did operate their vehicles recklessly during the course of the chase, there can be no dispute that Cauthron and BRPD did not "act as one" in causing the fatal accident. The accident, in the most literal sense, was caused by Cauthron's actions alone according to the factual

---

[3] Plaintiffs also cited to *Est. of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014), for the similar proposition that officers may be held jointly liable when each actively participates in a coordinated use of force that is excessive. The facts and rationale of *Gomez* are inapplicable to the present case for those reasons provided above—namely, that there was no coordinated application of force by a group of officers that led to the injuries at issue here. Unlike in *Gomez*, it is clear that only one officer directly caused the fatalities in question, and that officer was Cauthron.

14

allegations in Plaintiffs' Amended Complaint. Only Cauthron ran the red light, and only Cauthron collided with Plaintiffs' decedent's vehicle. There are no allegations that Cauthron was directed, explicitly or implicitly, by BRPD to do so, and for this reason, along with those given above, *Nesmith* does not provide support for Plaintiffs' theory of liability.

Finally, the Court has conducted its own review of the relevant authorities, and has been unable to find any caselaw supporting the theory of liability propounded by Plaintiffs, where one municipality may be held liable for the acts of another municipality's employee, despite the first municipality having no meaningful connection, either through joint training or supervision, to the second municipality's employee before or during the complained-of conduct. Plaintiffs' case against the City/Parish in this way is therefore dissimilar from plaintiffs in other notable failure to train and/or discipline cases, *e.g. Vess v. City of Dallas*, 608 F. Supp. 3d 434, 453 (N.D. Tex. 2022); *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 544 (W.D. Tex. 2017), in that Plaintiffs' theory of causation is too attenuated to permit the Court to make a reasonable inference that the "direct" or "moving" causation requirement is met. For this reason, Plaintiffs' federal claims against the City/Parish are subject to dismissal.

### b. Supplemental Jurisdiction

Having determined that Plaintiffs' federal claims against the City/Parish are subject to dismissal, the Court will exercise its discretion to decline to exercise supplemental jurisdiction over Plaintiffs' state law negligence claims against the same. *See Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993) ("District courts enjoy

wide discretion in determining whether to retain supplemental jurisdiction over a state law claim once all federal claims are dismissed."); see *Humphries v. Onebeacon Am. Ins. Co.*, No. CIV.A. 13-5426, 2014 WL 722262, at *4 (E.D. La. Feb. 24, 2014) (collecting cases).

Plaintiffs' state law negligence claims against the City/Parish will be dismissed without prejudice to allow for Plaintiffs to refile their suit in the appropriate state court venue.

V.  CONCLUSION

Accordingly,

**IT IS ORDERED** that the City/Parish's **Motion (Doc. 36)** be and is hereby **GRANTED**. Plaintiffs' federal claims against the City/Parish are hereby **DISMISSED WITH PREJUCIDE**. Plaintiffs' state law claims against the City/Parish are hereby **DISMISSED WITHOUT PREJUDICE**.

Baton Rouge, Louisiana, this 30th day of January, 2025

_____
**JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**